IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **CERDANT, INC., and THE LAPTOP** | : | |
| **GUY, INC., individually and on behalf** | : | |
| **of all others similarly-situated** | : | |
| | : | **Case No. 2:08-cv-186** |
| **Plaintiffs,** | : | |
| v. | : | **JUDGE ALGENON L. MARBLEY** |
| | : | Magistrate Judge Abel |
| **DHL EXPRESS (USA), INC.** | : | |
| | : | |
| **Defendant.** | : | |

**OPINION AND ORDER**

**I. INTRODUCTION**

This matter is before the Court on Plaintiffs, Cerdant, Inc. ("Cerdant") and the Laptop Guy, Inc.'s ("LTG," and together with Cerdant, "Plaintiffs") Motion for Class Certification. (Doc. 43.)  Plaintiffs claim that Defendant, DHL Express (USA), Inc. ("DHL") had a scheme and engaged in a common course of conduct to charge customers for items that DHL never delivered.  In particular, Plaintiffs claim that it was DHL's regular practice to assess customer accounts as soon as a shipping waybill was created and that DHL charged "shipping fees" and "fuel surcharges" regardless of whether the waybill was later used to ship a package.

Plaintiffs now move to certify a class pursuant to Federal Rule of Civil Procedure 23(b)(3).  For the reasons set forth below, the Court **DENIES** Plaintiffs' Motion for Class Certification.

**II. BACKGROUND**

**A. Factual**

DHL is a subsidiary of Deutche Post, AG, a company providing package delivery.  In

August 2003 DHL acquired Airborne Express ("Airborne") and entered the United States market of domestic and international package delivery services.  In January 2009, DHL stopped general domestic package delivery services in the United States, instead focusing on international delivery services for its United States customers.

In order to ship packages using DHL's services, customers generated waybills.  A "waybill" is a shipping label and it provides passage within DHL's shipping services to any package upon which it is affixed.  Allegedly, it was DHL's policy and practice to bill customers for any waybills printed using DHL shipment automation tools unless a waybill was specifically voided.

Waybills could be created using a number of shipping options provided by DHL.  One such shipping option was WebShip, a program allowing DHL's domestic customers to print shipment paperwork, select billing options, schedule the pick-up and delivery of packages, and track packages that were in transit.  In order to use WebShip, customers were required to register online with DHL by providing an email address and certain billing information.  Customers also agreed to be bound by DHL's terms and conditions prior to using any of DHL's online services. DHL states that these terms of conditions have been revised several times and that DHL has been unable to determine all versions of the WebShip terms and conditions used during the proposed class period. Registration with WebShip allowed customers the ability to create and print their own waybills.  The customer then affixed the waybill to a package and tendered the package and the attached waybill to DHL for delivery.  DHL also provided to its customers a WebShip Quick Reference Guide.  One of the functions of the WebShip Quick Reference Guide was to notify customers who created waybills using WebShip that they would be billed for those waybills

unless they were properly voided.  DHL states that the WebShip Quick Reference Guide has been revised several times and that DHL has been unable to determine all versions of the WebShip Quick Reference Guide used during the proposed class period.

Cerdant used WebShip to generate waybills in DHL's system.  In June 2004, Mr. Michael Johnson ("Johnson"), Cerdant's president, reviewed an invoice showing that Cerdant had been charged for five waybills.  Upon review, Johnson realized that Cerdant had only shipped packages using two of the waybills.  Johnson called DHL's customer service department and he was able to obtain a credit adjustment of $40.11 on Cerdant's invoice for waybills that had allegedly not been properly voided.  Johnson was also encouraged to contact DHL if Cerdant was billed and paid for a waybill that had been created but not used to ship a package.  Johnson then reviewed Cerdant's previous invoices from DHL and Airborne and discovered an Airborne invoice, dated October 29, 2003, that reflected a charge for a waybill Cerdant had created in DHL's shipping system but had not been submitted to DHL with a package.  Johnson sent a letter to DHL about DHL's policy of charging customers for all waybills that are created, regardless of whether the waybill is used to ship a package within the DHL shipping system.  It is the waybill dated October 29, 2003, upon which Cerdant now bases its claims in this litigation.

Another shipping option offered by DHL was EasyShip.  EasyShip was a system used by high volume customers.  It was installed by DHL at the customer's request on the customer's business premises and allowed the customer efficiently to ship a large number of packages with DHL.  Some EasyShip customers received DHL hardware and software to enable them to use the shipping system while others received only software, which was downloaded and installed on the customer's computer.  Similar to WebShip, DHL provided its EasyShip customers with an

EasyShip Quick Reference Guide.  The EasyShip Quick Reference Guide allegedly informed customers that they would be billed for waybills created using EasyShip unless they were properly voided.  DHL states that the EasyShip Quick Reference Guide has been revised several times and that DHL has been unable to determine all versions of the EasyShip Quick Reference Guide used during the proposed class period.  Only some EasyShip customers executed a formal written agreement with DHL to access the EasyShip system.  Where customers did execute written agreements with DHL, there was no form agreement used.  Instead some customers executed an EasyShip Placement Agreement.  DHL states that several different versions of Placement Agreements have been used and that it has not been able to locate all versions of the Placement Agreements executed by DHL and the EasyShip customers during the proposed class period.  Other EasyShip customers were required to sign an EasyShip Licensing Agreement.[1]

LTG was an EasyShip customer.  LTG never executed an EasyShip Placement Agreement or a Licensing Agreement.  Like other customers without executed formal written agreements, the terms and conditions of LTG's use of EasyShip would have been communicated orally by DHL.  These oral communications, which may have occurred between the customer and a variety of DHL employees may have included notification that the customer would be shipped for any waybills created in DHL's system that were not properly voided.  Between January 2006 and April or June 2007, LTG used EasyShip exclusively to ship packages, and 10 to 20 LTG employees may have been involved in LTG's shipping activities.  DHL held a

---

[1]DHL states that after 2007, all EasyShip Placement Agreements and Licensing Agreements included a term informing customers that shipments not picked up by DHL should be voided prior to the transaction to DHL of EasyShip data because "all shipments that are included in the end of the day manifest will be billed."  (Ex. 1 to Code Decl.; Judge Aff at ¶ 18.)

training for LTG employees on the use of EasyShip, but it is unclear which LTG employees attended and if those employees were trained on how properly to void unused waybills and any consequences for failing so to do.  As an EasyShip customer, LTG contacted DHL numerous times to make adjustments on specific waybill charges and requested between 20 and 50 refunds or credits.  According to DHL, however, LTG is unable to identify any specific waybill that was improperly charged and on which LTG bases its claims in this case.

In addition to WebShip and EasyShip, DHL had other shipping systems, such as Libra and Linkage.  Libra and Linkage had both been developed by Airborne prior to its acquisition by Deutsche Post, AG.  Other DHL customers had individual contracts with DHL.  DHL states that it has not maintained copies of all of the individual agreements that it and Airborne entered into with customers during the proposed class period.

Over the course of the litigation, DHL came to the determination that it is unable to identify those waybills that were: (1) generated by a DHL customer; (2) not submitted to DHL with a package for delivery; (3) paid by the customer; and (4) on which the customer did not obtain a refund or credit from DHL ("Orphan Waybills").  DHL used the Service Audit Database Archive ("SVA") to attempt to identify potential Orphan Waybills.[2]  The resulting list was

---

[2]Specifically DHL employee, Mr. DiProva wrote computer programs attempting to isolate waybills with certain characteristics: (1) including waybills for which a package was never tendered for delivery; (2) including waybills that had neither a pick-up scan nor a proof-of-delivery scan; (3) excluding waybills relating to international shipments; (4) excluding waybills without revenue information because those are waybills for which the customer was never billed; and (5) excluding waybills with corresponding recovery codes because a recovery code indicates that DHL misrouted the package and therefore would necessarily have meant that a package was tendered along with the waybill.

termed the "Speculative Waybill List."[3] The Speculative Waybill List is comprised of some 11 million Orphan Waybills that are associated with tens of thousands of DHL customers.

DHL alleges that there are several problems with attempting to use this Speculative Waybill List to determine the class in this litigation. For example, out-of-origin waybills are included on the Speculative Waybill List. Each DHL customer has an assigned origin station. When a customer tenders a package to DHL from a location outside of its designated origin station, DHL creates a new waybill number with the correct origin station to the package. DHL states that there is no way to purge all out-of-origin waybills from the Speculative Waybill List because a customer's assigned origin sation may change multiple times a year. Therefore, a manual check would be required.

Another problem with the Speculative Waybill List was duplicate records, which DHL eliminated. According to DHL, however, it was only possible to eliminate duplicate records created within the same month. If a duplicate record did not occur in the same month, then it is still on the Speculative Waybill List. Other problems include waybills on the Speculative Waybill List listed as "undefined." Undefined waybills are those that were not assigned to a category and not assigned to a customer, and therefore, could not have been used by a customer for a package. Undefined waybills can not be Orphaned Waybills.

Another problematic category included SDI Fast Track Labels, which must have a pick-up scan for it to be in DHL's system and which are manually scanned into the DHL system. An SDI Fast Track Label cannot be a potential Orphan Waybill, yet SDI Fast Track Labels continue

---

[3]DHL alleges that LTG is basing its claims in this litigation on the Speculative Waybill List exclusively.

to appear on the Sepculative Waybill List.  Other categories of waybills that should not appear on the Speculative Waybill List include: (1) waybills that are not DHL waybill numbers and for which there is no corresponding DHL customer; (2) waybills that have invoice numbers and not DHL waybill numbers; (3) Airborne@home sub shipments waybill numbers that reflect waybill numbers DHL automatically substitutes when a customer uses a duplicate waybill number.

Further, DHL states that it is unable to identify those Orphan Waybills located on the Speculative Waybill List for which the customer had received a refund or credit.  It is DHL policy and practice to issue credits and refunds at the account level and not at the waybill level.  DHL also does not formally memorialize in a centralized database or at the customer account level, the reason for a given refund.  According to DHL, it regularly issues refunds for a variety of reasons other than for Orphan Waybills including billing an incorrect, or a lost or damaged shipment.

## B. Procedural

In November 2004, Cerdant commenced a similar class action in Broward County, Florida.  After conducting class discovery and on the day of morning of the hearing on the motion to certify the proposed class, Cerdant voluntarily dismissed the Florida case.

That same day, on August 16, 2007, Cerdant filed a Class Action Complaint in the Court of Common Pleas for Franklin County, Ohio. On February 1, 2008, Cerdant filed a Motion for Leave to File First Amended Complaint seeking to add LTG as an additional plaintiff and class representative. The case was then removed to this Court on the basis of diversity jurisdiction.

DHL responded to the Complaint with a Rule 12(b)(6) Motion to Dismiss.  On March 16, 2009, this Court issued and Order granting DHL's Motion and dismissing all non-contract

claims.[4] In addition, the Court also held that DHL qualifies as a "motor carrier" under the Interstate Commerce Commission Termination Act ("ICCTA"), 49 U.S.C. § 13102(14), for the purposes of the transactions at issue in this litigation. On March 31, 2009, Plaintiffs filed an Amended Class Action Complaint against DHL alleging seven grounds on which they are entitled to relief: (1) breach of contract; (2) breach of the obligation of good faith, fair dealing, and commercial reasonableness; (3) unjust enrichment; (4) promissory estoppel; (5) money had and received; (6) declaratory judgment; and (7) an individual breach of contract claim on behalf of LTG.

On January 19, 2010, Plaintiffs submitted the Motion for Class Certification that is now before this Court. On August 11, 2010, after the issues had been fully briefed by the parties, the Court held a hearing on Plaintiffs Motion.

### III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 23 governs class actions. A plaintiff seeking class certification bears the burden of establishing compliance with all four requirements of Rule 23(a), referred to by the shorthand of "(1) numerosity, (2) commonality, (3) typicality, and (4) adequacy." Fed.R.Civ.P. 23(a); *Alkire v. Irving*, 330 F.3d 802, 820 (6th Cir. 2003). In addition, the plaintiff must satisfy one of the three sub-sections of Rule 23(b). *Powers v. Hamilton County Pub. Defender Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007). Before certifying a class action, this Court is required to conduct a "rigorous analysis" to determine whether the requirements of Rule 23 have been met. Gen. Tel. Co. v. Falcon, 457 U.S. 147, 161 (1982). In ruling on a motion for

---

[4]On March 30, 2009, this Court docketed an Amended Opinion and Order to reflect the correct title of the statute, pursuant to which some of Plaintiffs claims were dismissed.

class certification, a district court is prohibited from considering the merits of the plaintiffs' claims, but the court may consider evidence outside of the pleadings to determine whether the prerequisites of Rule 23 are met. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177 (1974)(establishing the principle that courts determining class certification should not consider the merits of the case); *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 n. 12 (1978) (stating that examination of the merits may be relevant to the determination of specific requirements of Rule 23); *In re Lorazepam & Clorazepate Antitrust Litig.*, 289 F.3d 98, 105 (D.C.Cir. 2002) (same); see also 1 Joseph M. McLaughlin, McLaughlin on Class Actions § 3:12 (6th ed. 2009) ("Consensus is rapidly emerging among the United States Courts of Appeal. The First, Second, Third, Fourth, Fifth, Seventh, Eighth, Tenth and Eleventh Circuits have expressly adopted certification standards that require rigorous factual review and preliminary factual and legal determinations with respect to the requirements of Rule 23 even if those determinations overlap with the merits."). Platiniffs bear the burden of showing that the elements of Rule 23 are met. See *Falcon*, 457 U.S. at 161; *Senter v. General Motors Corp.*, 532 F.2d 511, 522 (6th Cir.), *cert. denied*, 429 U.S. 870 (1976).

## IV. LAW AND ANALYSIS

### A. Requirements Under Rule (23)(a)

Under Rule 23(a), Plaintiffs must show that their proposed class is defined and ascertainable. Additionally, Plaintiffs must meet each of the Rule's enumerated requirements.

#### 1. Ascertainability

Though not an express requirement of Rule 23(a), "[a]scertainability goes to whether the

class has been defined such that it encompasses and identifiable group."[5] *Stewart v. Cheek & Zeehandelar, LLP*, 252 F.R.D. 387, 391 (S.D. Ohio 2008). The proposed class "must be capable of concise and exact definition." Metcalf v. Edelman, 64 F.R.D. 407, 409 (N.D. Ill. 1974). This prerequisite for class certification has been implied by other courts. *See Romberio v. Unumprovident Corp.*, Case No. 07-6404, 2009 WL 87510, *7 (6th Cir. 2009) (stating that "the need for individualized fact-finding" made the "class definition unsatisfactory") (citing *John v. Nat'l Sec. Fire and Cas. Co.*, 501 F.3d 443, 445 (5th Cir. 2007) (noting that "[t]he existence of an ascertainable class of persons to be represented by the proposed class representative is an implied prerequisite of Federal Rule of Civil Procedure 23"); *Crosby v. Social Sec. Admin.*, 796 F.2d 576, 580 (1st Cir. 1986) (explaining that a class definition should be based on objective criteria so that class members may be identified without individualized fact finding)). The "touchstone of ascertainability is whether the class is objectively defined, so that it does not implicate the merits of the case or call for individualized assessments to determine class membership." *Stewart*, 252 F.R.D. at 391 (citing *Napier v. Laurel County*, No. 06-368, 2008 WL 544468, *6 (E.D. Ky. Feb. 26, 2008) ("[A] class should not be certified where extensive factual inquiries are required to determine whether individuals are members of a proposed class."); *In re Chiang*, 385 F.3d 256, 272 (3d Cir. 2004) (commenting that classes defined in terms of subjective criteria, such as the class members' state of mind, are not ascertainable, and re-drawing the class definition so that it was not contingent upon class members' "belief" that

---

[5]Where Plaintiffs have failed to meet the implied requirement of ascertainability, courts have not found it necessary to conduct a full analysis of all Rule 23 prerequisites. *See Metcalf v. Edelman*, 64 F.R.D. 407, 409-10 (N.D. Ill. 1974); *Owner-Operator Indep. Drivers Ass'n. Inc. v. Arctic Express, Inc.*, No. C2:97-CV-00750, 2001 WL 34366624 (S.D. Ohio Sept. 4, 2001).

they were discriminated against)).

Where certification is sought pursuant to Rule 23(b)(3), as is the case here, precise definition of the class is required because Rule 23(b)(3) provides for monetary relief and requires notice to allow class members to opt out of the litigation. *See Finch v. New York State Office of Children and Family Services*, 252 F.R.D. 192, 198 (S.D.N.Y. 2008).

Here, Plaintiffs' proposed class is defined as:

All individuals and businesses who have been charged "shipping fees" and/or "fuel surcharges" by DHL, or its predecessors of interest, for items that were never tendered to DHL for delivery. (Doc. 33 Am. Compl. ¶ 28.)

This Court has previously ruled that DHL qualifies as a motor carrier under the ICCTA, 49 U.S.C. § 13102(14), for the purposes of the transactions at issue in this litigation.  (*See* Doc. 30 Order.)  The ICCTA provides in part that shippers "must contest the original bill or subsequent bill within 180 days of receipt of the bill in order to have the right to contest such charges."  49 U.S.C. § 13710(a)(3)(B).  Under the statute, "[t]he term 'individual shipper' means any person who– (A) is the ... of a household goods shipment; (B) is identified as the shipper...on the face of the bill of lading; (3) owns the goods being transported; and (D) pays his or her own tariff transportation charges."  49 U.S.C. § 13102(13).   Other courts have found that this 180-day rule applies to all actions, whether before the Surface Transportation Board or in court, and regardless of the nature of the claim.  *Avery Dennison Corp. v. Con-Way Transp. Servs. Inc.*, No. 2005-L-218, 2006 WL 3350761, *5-6 (Ohio Ct. App. Nov. 17, 2006) (applying 49 U.S.C. § 13710(a)(3)(B) to a breach of contract claim and finding that the statute "does not discuss a formal method for notification of a billing dispute," but "merely requires a shipper to contest the original bill within 180 days of receipt").

Under the terms of the statute, any DHL customer who failed to contest a bill within 180 days lacks standing. Neither Cerdant nor LTG has shown that they satisfied the 180-day rule prior to filing this suit.[6] While Cerdant and LTG claim that Orphan Waybills do not fall under the purview of the ICCTA, at its core this litigation is about the relationship between DHL, a motor carrier, and Cerdant and LTG, as shippers, and the ICCTA was implemented to address shipping disputes. To the extent that the proposed class definition does not limit the class to those DHL customers who complied with the 180-day notice provision, it is overbroad. Additionally, to the extent that this court would have to engage in individualized factual inquiries to determine those class members who complied with the 180-day requirement, the class is not ascertainable.

Further, DHL has identified numerous reasons why Plaintiffs reliance upon the Specutive Waybill List to identify proposed class members is flawed. Out of origin waybills, undefined waybills, STFL waybills, Easy Return waybills, wabybills lacking waybill numbers and instead having invoice numbers, and waybills for which credits and refunds may have been issued all appear on the Speculative Waybill List. DHL has stated that the only way properly to identify a class would be an individualized assessment of Orphan Waybills. Plaintiffs have made no effort to rebut this assertion and have instead relied upon the Speculative Waybill List. Where

---

[6]In *Mastercraft Interiors, Ltd. v. ABF Freight Sys., Inc.*, a district court held that the "180 day regulatory requirement cannot be imposed upon actions to enforce a contract under Maryland law." 350 F.Supp. 2d 686, 694 (D.Md. 2004). This case is however, is not binding on this Court and goes against the natural language of the statute. Further, the Mastercraft court was considering the 180 day requirement in the context of Maryland contract law. *Id.* In contrast, state courts considering the relationship between the statute and Ohio law have found that imposition of the 180 day notice requirement was proper. *See Avery Dennison Corp. v. Con-Way Transp. Servs. Inc.*, No. 2005-L-218, 2006 WL 3350761, *5-6 (Ohio Ct. App. Nov. 17, 2006)

individualized assessments are required, the proposed class is not ascertainable, and class certification is not proper. *Stewart*, 252 F.R.D. at 391. Plaintiffs have not met their burden to show that their proposed class is ascertainable. Class certification is therefore, improper.

### 2. Numerosity

To establish this requirement for class certification, Plaintiffs must demonstrate that "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). The Sixth Circuit has stated that "[r]ather than naming a specific number, Rule 23 places the size of the class in the context of actual impracticability of joinder." *Turnage v. Norfolk Southern Corp.*, 307 Fed. Appx. 918, 921 (6th Cir. 2009); Though "[w]hen class size reaches substantial proportions ... the impracticability requirement is usually satisfied by the numbers alone." *In re Am. Med. Sys.*, 75 F.3d 1069, 1079 (6th Cir. 1996); *see also Golden v. City of Columbus*, 404 F.3d 950, 966 (6th Cir. 2005) ("impracticability of joinder must be positively shown, and cannot be speculative").

Plaintiffs rely on the Speculative Waybill List for their assertion that there are 11 million Orphan Waybills and potentially tens of thousands of DHL customers that are class members. DHL, while pointing out several problems with Plaintiffs' reliance on the Speculative Waybill List, does not contest that the proposed class meets this requirement. Therefore the numerosity requirement is satisfied here.

### 3. Commonality

To establish this prerequisite for class certification, Plaintiffs need to show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). This "predominance requirement is met if this common question is at the heart of the litigation." *Powers v. Hamilton*

*County Public Defender Com'n.*, 501 F.3d 592, 619 (6th Cir. 2007) (holding that the commonality requirement was met where "[t]he despositive facts and law [were] the same as to each class member"). Where plaintiffs allege a "single course of wrongful conduct," class certification may be particularly appropriate. *See Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988). The Sixth Circuit has elaborated that "the mere fact that questions peculiar to each individual member of the class remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible." *Id*. Where, however "any claim the class may have had in common [threatens] to splinter into individualized claims," the requirement of predominance is not met. *Ball v. Union Carbide Corp.*, 385 F.3d 713, 728 (6th Cir. 2004).

In this case, Plaintiffs's proposed class definition is not limited to those DHL customers who had written contracts for shipping services with DHL. Indeed, LTG did not have a written contract with DHL though it was an EasyShip customer. Plaintiffs breach of contract claim necessitates showing that there was a contract between each of the class members, which DHL breached. Plaintiffs contend that at the end of 2004 DHL's Terms and Conditions provided that any "agreement shall be governed by the laws of the State of Florida and the United States." (Doc. 33 Am. Compl. Ex. 1 p. 3.) DHL states that not all contracts contain this choice of law provision. Further, DHL contends that there is variation among the contracts, including oral contracts and other contracts some which contain mandatory arbitration clauses. In addition, DHL has stated that it unable to identify all formally executed contracts which it had with clients.

The Sixth Circuit has previously held that where there are multiple governing contracts a

-14-

class cannot establish commonality. *Sprague*, 133 F.3d at 398 (finding that the proposed class of early retirees lacked commonality because some early retirees had signed one of three different contracts and others had based their claims on oral representations from the defendant's employees); *see also Jenkins v. Macatawa Bank Corp.*, Nos. 1:03-CV-321, 1:05-CV-460, 1:05-CV-499, 2007 WL 1295991 (W.D. Mich., 2007) (finding that the claims were not commmon because there "were three materially different versions of the agreement" and "individual class members could only be placed in the appropriate group after individualized proof about a given investor's contract"); *Mayo v. Sears, Roebuck & Co.*, 148 F.R.D. 576, 590 (S.D. Ohio 1993) (finding that only class members who had used a specific credit application met the requirement of commonality but others who utilized substantially different credit agreements were uncommon). Here, there are a number of contracts at issue relating to different shipping programs provided by DHL. Moreover, there are customers who did not have a formal written contract with DHL. Inquiry into the understanding of those customers, like LTG, as to what was conveyed, via training or otherwise, about the policy for billing customers once a waybill had been printed undermines the requirement that common issues predominate. Plaintiffs would like to rely on DHL's policy of charging customers once a waybill was generated and printed as wrongful conduct, despite the fact that customers were subject to a variety of oral or written agreements governing shipping services. Indeed, "plaintiffs can not advance a single collective breach of contract action on the basis of multiple contracts."[7] *Broussard v. Meineke Discount*

---

[7] Under *Broussard*, class certification is also improper where a defendant's affirmative defenses depend on facts particular to each plaintiff's case. 155 F.3d at 342. Plaintiffs have cited no authority supporting their statement that DHL's defenses sometimes create common issues.

*Muffler Shops, Inc.*, 155 F.3d 331, 331 (4th Cir. 1998); see also *Carpenter v. BMW of N. Am., Inc.*, 1999 WL 415390, *2 (E.D.Pa.1999) (noting that "where the applicable law derives from the law of the 50 states, as opposed to a unitary federal cause of action, differences in state law will 'compound the [ ] disparities' among the class members from the different states"). Thus, the requirement that common issues predominate is not met and class certification is not appropriate.

### 4. Typicality

The requirement of typicality is met by demonstrating that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3); see also Fed. R. Civ. P. 23(c)(1)(B) (requiring a district court, when certifying a class, to define not only the class but also the "class claims, issues, or defenses"). Under Rule 23, "a claim is typical 'if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.'" *Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 561 (6th Cir. 2007) (citing *In re Am. Med. Sys., Inc.*, 75 F.3d at 1082. The premise of this requirement is "simply stated: as goes the claim of the named plaintiff, so go the claims of the class." *Sprague v. General Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998) (finding that a proposed class of "early retirees" failed the typicality test because "[i]n pursuing their own claims, the named plaintiffs could not advance the interests of the entire early retiree class"). To meet the typicality requirement "a representative's claim need not always involve the same facts or law, provided there is a common element of fact or law." *Senter*, 532 F.2d at 525 n. 31. Nonetheless, "[t]here must be some connection ... between the merits of each individual claim and the conduct affecting the class." *Romberio*, Case No. 07-6404, 2009 WL 87510 at *8. Where "individualized assessments are necessary," the requirement

for typicality is not satisfied. *Id.*, *see also Parke v. First Reliance Standard Life Ins. Co.*, 368 F.3d 999, 1005 (8th Cir. 2004) (affirming denial of class certification where even if the plaintiff could show that a breach by the defendant caused her harm, whether a breach caused harm to others in the proposed class remained "a case-by-case determination") *Holmes v. Pension Plan of Bethlehem Steel Corp.*, 213 F.3d 124, 137-38 (3d Cir. 2000) (affirming district court's denial of class certification for class of beneficiaries whose benefits were wrongfully delayed because "the issue of liability itself requires an individualized inquiry into the equities of each claim."

      DHL argues that by refusing to seek a refund on the October 29, 2003 waybill, Cerdant:(1) manufactured its claim in a way that renders Cerdant atypical; (2) failed to mitigate damages; and (3) has unclean hands because it misrepresented the origin of the waybill in question in order to save on shipping costs. These actions allegedly render Cerdant atypical. Further, LTG has asserted an individual claim under Count 7 of the First Amended Class Action Complaint for an individual breach of contract action unrelated to the claim advanced by the class. This claim involves billing errors resulting in overcharges and problems with renegotiated rates. The claim does not apply to the class or any class member. DHL argues that there is no relationship between the individual injury alleged by LTG and the practice relating to the Orphan Waybills subject to the class litigation.

      Plaintiffs make no effort to address or rebut DHL's claims that they are atypical. Plaintiffs have failed to meet their burden to show that in this case, "as goes the claim of the named plaintiff[s], so go the claims of the class." *Sprague v. General Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998). The requirement of typicality is not met and class certification is inappropriate.

### 5. Adequacy

To establish the prerequisite of adequacy Plaintiffs must show that they, as "the representative parties[,] will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Under Rule 23, the named Plaintiffs must belong to the class, have the same interest as the class, and suffer the same injury as the class members. *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997). The adequacy requirement "serves to uncover conflicts of interest between named parties and the class they seek to represent." Id. The Sixth Circuit has stated that it "reviews the adequacy of class representation to determine whether class counsel are qualified, experienced and generally able to conduct the litigation, and to consider whether the class members have interests that are not antagonistic to one another." *Stout v. J.D. Byrider*, 228 F.3d 709, 717 (6th Cir. 2000). Representation is not adequate when "there is evidence that the representative plaintiffs appear unable to vigorously prosecute the interests of the class." Id. (internal citations omitted). Adequacy also considers "whether class counsel has the qualifications and experience to effectively prosecute the case." *Stewart*, 252 F.R.D. at 393 (citing *Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 626 (6th Cir. 2007)).

DHL alleges that Plaintiffs are not adequate representatives because they do not have common interests with the unnamed class members and because Plaintiffs have failed adequately to represent and to vigorously prosecute the class action. DHL alleges that Plaintiffs official Rule 30(b)(6) representatives lack basic factual knowledge of the case, have not reviewed previous Court rulings in this case, and are not engaged in supervising the work of class counsel. Plaintiffs respond that "Named Plaintiffs need not be lawyers and they need not pour hundreds of

hours into case [sic] in order to be adequate." (Doc. 56 Pl. Reply to Mot. for Class Cert. p. 5.)

Although Plaintiffs advocate rigorously to solidify their role as class representatives in this litigation, they have not demonstrated that they can prosecute this case adequately. For instance, LTG was unable to point to a single Orphan Waybill at issue in the litigation without reliance on the Speculative Waybill List. Since the Plaintiffs have failed to meet the requirements of ascertainability, commonality, and typicality, and therefore, do not share the same interests as the proposed class members, Plaintiffs are not adequate class representatives. The adequacy requirement is not met and class certification is inappropriate.

### B. Requirements Under Rule 23(b)(3)

Rule 23(b)(3), under which Plaintiffs seek certification, "a class action may be maintained if [: (1)] Rule 23(a) is satisfied;" and (2) "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."[8] Fed. R. Civ. P. 23(b).

As discussed above, Plaintiffs have failed to meet the requirements under Rule 23(a) for

---

[8] Matters relevant to a determination pursuant to class certification under Rule 23(b)(3) include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;
(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

class certification. Fed. R. Civ. P. 23(b)(3). Additionally, as discussed in Section IV.A.5, *supra*, Plaintiffs have failed to demonstrate that common issues of law or fact predominate "over any questions affecting only individual members" because of the variety of contracts at issue. *Id*. Therefore, class certification is not appropriate.

## IV. CONCLUSION

For the reasons set forth above, Plaintiffs Motion for Class Certification is **DENIED**.

**IT IS SO ORDERED.**

                                   **s/Algenon L. Marbley**
                                 **ALGENON L. MARBLEY**
                                 **UNITED STATES DISTRICT COURT**

**Dated: August 25, 2010**